In the matter of the Application for Water Rights Of the King Consolidated Ditch Company, Morrison Consolidated Ditch Company, Los Pinos Ditch Company, Thompson–Epperson Ditch Company, Pine River Canal, Sullivan Ditch Company, Bear Creek and Pine River Ditch (Remmow Land Co., LP; Robert Williams d/b/a Williams Ranch; Jarrett F. Cook; and Robert S. Dulin and Susan W. Dulin), and Spring Creek Ditch Company in the Pine River Drainage in La Plata County.

The SOUTHERN UTE INDIAN TRIBE, Appellant

v.

KING CONSOLIDATED DITCH COMPANY; Morrison Consolidated Ditch Company; Los Pinos Ditch Company; Thompson–Epperson Ditch Company; Pine River Canal; Sullivan Ditch Company; Bear Creek and Pine River Ditch (Remmow Land Co., LP; Robert Williams d/b/a Williams Ranch; Jarrett F. Cook; and Robert S. Dulin and Susan W. Dulin); and Spring Creek Ditch Company, Appellees.

No. 09SA374.

Supreme Court of Colorado, En Banc.

March 14, 2011.

Maynes Bradford Shipps & Sheftel, LLP, Janice Sheftel, Katherine A. Burke, Adam T. Reeves, Durango, Colorado, Attorneys for Appellant.

Miller, Agro, & Robbins, L.L.C., Nancy Agro, Durango, Colorado, The Craig Law Firm P.C., Geoffrey M. Craig, Durango, Colorado, Attorneys for Appellees.

Justice HOBBS delivered the Opinion of the Court.

In this appeal from a judgment of the District Court for Water Division No. 7, the Southern Ute Tribe ("the Tribe") seeks to set aside the judgment on three grounds: (1) this case involves a declaratory judgment action requiring personal service on the Tribe and other affected parties pursuant to C.R.C.P. 19 and 4, and publication of resume notice pursuant to section 37–92–302(3)(a), C.R.S. (2010) was insufficient; (2) if the applicants ("the Ditch Companies") properly filed this case as an application for a determination of a water right under section 37–92–302(1)(a), the lack of verification of the application when it was filed prevented the court from proceeding; and (3) the water court abused its discretion by denying the Tribe's motion to intervene pursuant to section 37–92–304(3), C.R.S. (2010) and in disallowing its late-filed statement of opposition.[1]

---

1. The Tribe phrases the issues on appeal as follows:

 1. Whether a request for a water court to interpret the meaning of a previously entered decree is a "determination of a water right," as that term is used in Section 37–92–302(1)(a), C.R.S. (2010), and, therefore, entitled to benefit from special statutory procedures, including resume notice.

 2. Whether the "relation back" doctrine and C.R.C.P. 15(c) apply to amendments attempting to correct procedural errors in applications for determinations of water rights, including failure to verify such an application.

 3. Whether the Southern Ute Indian Tribe ("Tribe") met the requirements for intervention set forth in Section 37–92–304(3), C.R.S. (2010), in this case.

The Ditch Companies filed an application in this case for a water court determination that two previously adjudicated decrees included priorities for year-round stockwatering and domestic uses incidental to the appropriation and use of water for agricultural purposes, including wintertime use. Resume notice and newspaper publication occurred. One of the Ditch Companies belatedly verified the application. The Tribe did not file a statement of opposition to the application within the time period specified by section 37–92–302(1)(b) and (c). No statements of opposition were filed by any other party. The water court considered and denied the Tribe's motion to intervene and disallowed its untimely statement of opposition. The water court then proceeded to consider the case and entered its written judgment that the previously adjudicated decrees had awarded the Ditch Companies priority dates for year-round stockwatering and domestic uses incidental to the appropriation and use of water for agricultural purposes, including wintertime use.

We hold that the application in this case is for a determination of a water right under section 37–92–302(1)(a) and the water court properly proceeded in compliance with the resume notice procedures of section 37–92–302(3); the belated verification of the application related back to the original application; and the water court did not abuse its discretion in denying the Tribe's motion to intervene and disallowing its untimely filed statement of opposition.

## I.

This case centers on various water rights in the Pine River drainage of Colorado that the La Plata County District Court adjudicated pursuant to a general adjudication in 1934 and a supplemental adjudication in 1966 ("the Initial Decrees").[2] Paragraph 8 of the 1934 decree included the right to use water for "domestic purposes, incidental to the appropriation and use for agricultural purposes." In the 1966 decree, paragraph 9 of the preamble clarified this language to include the right to use water for "*domestic and stockwater* purposes, incidental to the appropriation and use for agricultural purposes." (Emphasis added).

Between 2001 and 2005, seven of the eight Ditch Companies, who hold some of the initially decreed Pine River rights, separately filed applications in the water court for wintertime stock watering rights from the Pine River (the "Winter Applications").[3] The Tribe, another holder of some of the initially decreed Pine River rights, filed statements of opposition to the Winter Applications.

In its written consultation report filed with the water court pursuant to section 37–92–302(4), the Division Engineer took the position that the Ditch Companies' already held the right to make wintertime stockwater use under the priorities of the Initial Decrees and had historically exercised that right. The Division Engineer's written report recommended that the water court enter an order or decree so finding in each of the Ditch Companies' cases, and then dismiss the Winter Applications. The report reads, in part:

It is believed that all of the ditches that have applied for these non-irrigation season water rights have probably had winter diversions incidental to agricultural practices which date back to the early appropriations of water for the ditches ...

Therefore, as long as the non-irrigation season uses of domestic and stockwater is not expanded beyond the historic practices, and the primary use of the water in these ditches is still for irrigation of agricultural lands, it is not believed a new

---

**2.** *In re the Adjudication of Priorities of Water Rights for Irrigation Purposes,* No. 1248 (La Plata County District Court 1934); *In re the Supplemental Adjudication of Priorities of Water Rights to the Use of Water,* No. 1248–B (La Plata County District Court 1966).

**3.** The Winter Applications included *In re King Consolidated Ditch Co.,* 01CW104 (filed Dec. 28, 2001); *In re Morrison Consolidated Ditch Co.,* 01CW108 (filed Dec. 31, 2001); *In re Los Pinos Ditch Co.,* 05CW70 (filed Dec. 20, 2005); *In re Thompson–Epperson Ditch Co.,* 05CW71 (filed Dec., 20 2005); *In re Sullivan Ditch Co.,* 05CW72 (filed Dec. 21, 2005); *In re Remmow Land Co.,* 05CW89 (filed Dec. 29, 2005); *In re Pine River Canal Co.,* 05CW98 (filed Dec. 30, 2009). The Spring Creek Ditch Co. apparently did not file such an application.

water right is needed for these purposes....

It would be beneficial to have court recognition of the non-irrigation uses of domestic and stockwater historically used by these ditches, either by Order of the court or by decrees entered in each individual case.... If the court is in agreement, an Order could be issued recognizing these uses as being allowed in the 1934 and 1966 adjudications based on historic practices, and the applications in these cases could be dismissed.

The Ditch Companies entered into settlement discussions with the Tribe to dispose of the Winter Applications in accordance with the Division Engineer's consultation report, but settlement was not achieved. Counsel for the Ditch Companies then informed counsel for the Tribe that the Ditch Companies would file a separate, consolidated application to confirm that their wintertime stock watering use had been adjudicated in the Initial Decrees.

On March 25, 2009, the Ditch Companies filed with the clerk of the water court an application for a determination of water rights, asking the water court to confirm that the Initial Decrees had adjudicated priorities for stock watering rights decreed to their diversion structures, including wintertime use. That same day, the Ditch Companies notified the Tribe of the consolidated application via e-mail.

The application is entitled "Application For Determination of Water Rights (Surface)," follows the standard form for such an application adopted by the water judges pursuant to section 37–92–302(2)(a), and requests the water court to "issue an order interpreting Case Numbers 1248 and 1248–B to include year-round stockwatering and domestic uses incidental to agricultural purposes."

On March 26, 2009, the Ditch Companies made a motion to vacate the trial dates for the Winter Applications and hold those cases in abeyance. The Ditch Companies served the motion on counsel for the Tribe. The motion recites that the Ditch Companies

filed Case Number 2009CW22 requesting the Court to confirm that Case Numbers 1248 and 1248–B adjudicated stockwater and domestic use incidental to agricultural uses. If the Court makes an affirmative determination, the applicants will not need an additional water right unless supplemental water is necessary.

On March 30, 2009, the Tribe filed a written consent to the motion, and the water court stayed all seven Winter Applications pending the outcome of the consolidated application.

In early April 2009, the water clerk prepared and published notice of the Ditch Companies' application in the monthly resume of water right applications in the Durango Herald newspaper. On May 27, 2009, one of the Ditch Companies filed a verification of the application.

On June 30, 2009, the Tribe filed simultaneous motions to intervene in this case and oppose the application. The Tribe contended that the application had been improperly filed as a request for a determination of water rights rather than as a declaratory judgment action that requires personal service under C.R.C.P. 19 and 4. The Tribe also asserted that the water court lacked authority to proceed with the application because it was not verified when filed.

The water court concluded that the late-filed verification "related back" to the filing of the application, disallowed Tribe's statement of opposition as untimely filed, and exercised its discretion to deny the intervention motion. The water court's written order recites, in part:

C.R.S. 37–92–304(3) enumerates the specific grounds required to intervene in a Water Court proceeding. In addition to paying the appropriate fee, the proposed Intervenor must show "mistake, inadvertence, surprise, or excusable neglect," or that its proposed intervention is "to support a referee's ruling."

Here, the Opposer has not alleged or proven that [sic] any of these criteria in its Motion to Intervene. This is not surprising since allegations of mistake, surprise or inadvertence would be factually unfounded. The Opposer had actual notice of this Application, in addition to the resume notice published in the Durango Herald and this Court's website sufficient to trig-

ger an inquiry of the extent of the subject decree....

The case is in its final stages and would be completed fairly soon. The Division Engineer has already prepared and filed a Consultation Report favorable to the applicant's position. Had Opposer filed a timely statement of opposition to the Application, the issues it now raises could have been more fully and appropriately addressed by the Division Engineer's report and the Applicant would have had to address those matters before the referee's decision....

To allow intervention now would frustrate the legislative intent of expediency and finality. At this point, the Division Engineer and the Applicant have already worked to resolve the outstanding issues in this and three other cases. Their careful resolution regarding the scope of the Decree, that now resolves several water issues before the court and avoids duplicative decrees, will be wastefully ignored. If the court grants the motion and the Opposer becomes a party in the trial, the matter will likely not be resolved for at least one to two years and the Applicant will be required to spend tens of thousands of dollars on a trial and related work to get to the result they have already agreed upon with the Division Engineer. The State, both through the Division Engineer's office and the Water Court, will needlessly expend additional resources and time on this matter. The Opposer cannot cure its failure to oppose this issue prior to the referee's ruling by filing a Motion to Intervene.

The water court later found that the Initial Decrees included wintertime stock watering right use for the Ditch Companies' diversions, and entered judgment accordingly. The court's Findings of Fact, Conclusions of Law, and Decree recite, in part:

Year round stockwatering and year round domestic uses incidental to the appropriation and use for agricultural purposes are hereby confirmed as part of and included within the decreed uses in Case Numbers 1248 and 1248–B. This ruling applies to all ditches decreed in Case Numbers 1248 and 1248–B in accordance with the amounts and priorities adjudicated to each ditch in those cases. Water diverted for stockwatering and domestic uses in particular instances will continue to be administered by the Division Engineer and Water Commissioners under their statutory authority, the decree language in Case Numbers 1248 and 1248–B, and general principles of Colorado water law.

After the water court denied the Tribe's motion to reconsider, the Tribe appealed to us seeking to vacate the judgment.

## II.

The Ditch Companies filed the application in this case for a water court determination that two previously adjudicated decrees included priorities for stockwatering and domestic uses incidental to the appropriation and use of water for agricultural purposes, including wintertime use. We hold that the application in this case is for a determination of a water right under section 37–92–302(1)(a) and the water court properly proceeded in compliance with the resume notice procedures of section 37–92–302(3); the belated verification of the application related back to the original application; and the water court did not abuse its discretion in denying the Tribe's motion to intervene and in disallowing its untimely filed statement of opposition.

### A.

### Standard of Review

We review de novo a lower court's conclusions of law. *Freedom Colo. Info., Inc. v. El Paso Cnty. Sheriff's Dept.*, 196 P.3d 892, 897 (Colo.2008). We set aside a trial court's factual findings only when they are "so clearly erroneous as to find no support in the record." *People ex rel. AJL*, 243 P.3d 244, 250 (Colo.2010) (citation omitted).

Statutory construction proceeds de novo. *Specialty Rests. Corp. v. Nelson*, 231 P.3d 393, 397 (Colo.2010). When construing a statute, we effectuate the intent of the General Assembly; we look to the plain meaning of the statutory language and consider it within the context of the statute as a

whole. *Bly v. Story,* 241 P.3d 529, 533 (Colo. 2010). We construe the entire statutory scheme to give consistent, harmonious, and sensible effect to all parts. *Climax Molybdenum Co. v. Walter,* 812 P.2d 1168, 1174 (Colo. 1991).

■■■ If the statutory language is clear, we apply it. *Specialty Rests. Corp.,* 231 P.3d at 397. If the statutory language is ambiguous, we may use other tools of statutory interpretation to determine the General Assembly's intent. *Crandall v. City of Denver,* 238 P.3d 659, 662 (Colo.2010). We avoid interpretations that would lead to an absurd result. *Id.*

■■■ The water court has authority to determine a prior decree's setting, intent, meaning and effect when adjudicating an application for a water use right or ascertaining the existence of an undecreed enlargement of a decreed water right. *Tonko v. Mallow,* 154 P.3d 397, 404–05 (Colo.2007); *Cherokee Metro. Dist. v. Simpson,* 148 P.3d 142, 146–47 (Colo.2006). Water matters involve determinations regarding the right to use water, the quantification of a water right, or a change in a previously decreed water right. *Crystal Lakes Water & Sewer Ass'n v. Backlund,* 908 P.2d 534, 540 (Colo.1996).

## B.

### Determination of a Water Right under Section 37–92–302(1)(a)

The Colorado Rules of Civil Procedure preserve special statutory procedures, such as those contained in the Water Right Determination and Administration Act of 1969, §§ 37–92–101 to –602 (the "1969 Act"). C.R.C.P. 81(a) (providing that the Rules of Civil Procedure "do not govern procedure and practice in any special statutory proceeding insofar as they are inconsistent or in conflict with the procedure and practice provided by the applicable statute"). The Tribe concedes that the subject matter in this case

is a water matter within the special statutory jurisdiction of the water court pursuant to section 37–92–203(1), but it contends that the application filed in this case was not properly filed as an application for determination of a water right under section 37–92–302(1)(a) for which the Colorado General Assembly intended the resume notice and newspaper publication procedure of section 37–92–302(3) to apply. Accordingly, we turn to this issue.

### 1. Plain Language

Section 37–92–302(1)(a) provides:

*Any person who desires a determination of a water right* or a conditional water right *and the amount and priority thereof,* including a determination that a conditional water right has become a water right by reason of the completion of the appropriation,[4] a determination with respect to a change of a water right, approval of a plan for augmentation, finding of reasonable diligence, approval of a proposed or existing exchange of water under section 37–80–120 or 37–83–104, or approval to use water outside the state pursuant to section 37–81–101 shall file with the water clerk a verified application setting forth facts supporting the ruling sought, a copy of which shall be sent by the water clerk to the state engineer and the division engineer. The term "determination of a water right or conditional water right" includes any plan or change in plan under the provisions of section 37–45–118(1)(b)(II) that is or has been incorporated into a decree.

(Emphasis added).

■■■ We begin by examining the plain language of the phrase "determination of a water right." Words and phrases should be given effect according to their plain and ordinary meaning. *Granite State Ins. Co. v. Ken Caryl Ranch Master Ass'n,* 183 P.3d 563, 567 (Colo.2008). The ordinary meaning of a "determination" is the "settling and ending of a controversy especially in a judicial setting."

---

4. The words "including a determination that a conditional water right has become a water right by reason of the completion of the appropriation" do not provide a limitation on the term "determination of a water right." A statutory definition of a term as "including" certain things does not restrict the meaning to those items included. The word "include" is ordinarily used as a word of extension or enlargement. *Cherry Creek School Dist. No. 5 v. Voelker,* 859 P.2d 805, 813 (Colo.1993).

*Webster's New International Dictionary* 616 (3rd ed. 2002). "Water right" is defined in section 37–92–103(12) of the 1969 Act and means "a right to use *in accordance with its priority* a certain portion of the waters of the state by reason of the appropriation of the same." (Emphasis added).

■ The application in this case qualifies as an application for "determination of a water right" under the plain words of section 37–92–302(1)(a). The Ditch Companies filed an application for a determination that the water rights previously adjudicated in the Initial Decrees (case numbers 1248 and 1248–B) included priorities for year-round stockwatering and domestic use incidental to agricultural purposes, including wintertime use. The application is entitled "Application For Determination of Water Rights (Surface)" and provides the information requested under the standard form adopted by the water judges pursuant to section 37–92–302(2)(a) and Rule 3(a) of the Uniform Local Rules For All State Water Court Divisions.

■ Water courts are authorized to construe and make determinations regarding the scope of water rights adjudicated in prior decrees. *Crystal Lakes Water and Sewer Ass'n v. Blacklund*, 908 P.2d at 542. Section 37–92–302(1)(a) does not restrict a water right to one determination only, nor does it require that any subsequent determination after the initial determination of a water right must necessarily result in the assignment of a new priority date. This is consistent with the fundamental principle that adjudications of water rights have as their object the confirmation of pre-existing rights. *Groundwater Appropriators of S. Platte River Basin, Inc. v. City of Boulder*, 73 P.3d 22, 26 (Colo.2003).

■ Once a water right has been adjudicated, it is given a legally vested priority date that entitles the owner to a certain amount of water subject only to the rights of senior appropriators and the amount of water that is available for appropriation. *Navajo Development Co., Inc. v. Sanderson*, 655 P.2d 1374, 1377 (Colo.1982). Section 37–92–306, C.R.S. (2010), which addresses the assignment of priority dates when the claim for a water right has not been adjudicated previously, does not require the holder of an existing adjudicated water right to surrender the right's priority and take a junior priority when, as here, the applicant files an application in water court seeking confirmation that an earlier decree carries with it a senior priority for the water use at issue. *See United States v. Bell*, 724 P.2d 631, 634 (Colo.1986). The General Assembly has required no such exaction or devaluation of a water right as the price for a water court being able to consider an application to determine the scope and meaning of a prior decree within the meaning of the term "determination of a water right."

## 2. Resume Notice and Newspaper Publication Procedure

■ The resume notice and newspaper publication provisions of section 37–92–302(3) and C.R.C.P. 90, both of which authorize resume notice for water matters involving and affecting the relative priorities of water rights on a stream system, are broadly applicable to water court applications. The General Assembly included the resume notice and newspaper publication procedures in the 1969 Act, in lieu of personal service, because water rights are decreed to structures, rather than individual owners, and water court proceedings for the determination of water rights are proceedings in rem. *Well Augmentation Subdistrict v. City of Aurora*, 221 P.3d 399, 408–09 (Colo.2009).

■ When notice of the application is published through the resume procedure, the court obtains jurisdiction over persons and property affected by the application; the purpose of resume publication is to give notice of the nature, scope and impact of the decree sought, thereby enabling any interested person to file a statement of opposition and contest the factual or legal grounds for issuance of such a decree. *Dallas Creek Water Co. v. Huey*, 933 P.2d 27, 38 (Colo. 1997).

C.R.C.P. 90(a) requires the water clerk to receive and file all applications and number them upon payment of filing fees. C.R.C.P. 90(b) commands the water clerk to include in the resume all applications filed during the preceding month that substantially contain

the information required by Rule 3 of the Uniform Local Rules for All State Water Court Divisions and the standard forms approved by the water judges under section 37–92–302(2)(a).

We have held personal service under C.R.C.P. 4 and 19 to be required in water matters only in limited circumstances. For example, in *Gardner v. State*, 200 Colo. 221, 614 P.2d 357, 361 (1980), we required such service because the proceeding was aimed at terminating, by abandonment, a specific person's ownership interest in a water right. Other instances of party versus party litigation in water court that come under the personal service requirements of C.R.C.P. 4 and 19 include injunction and declaratory judgment actions where relief is sought against a named party, as opposed to an application affecting all water rights on a stream system.

Examples include *City of Golden v. Simpson*, 83 P.3d 87 (Colo.2004), an injunction action by an individual water user against the state engineer, *Archuleta v. Gomez*, 200 P.3d 333, (Colo.2009), an injunction action involving a claim for adverse possession of a water right pitting individuals within a ditch system against each other, and *N. Sterling Irrigation Dist. v. Simpson*, 202 P.3d 1207 (Colo.2009), a declaratory judgment action between a water district and the state engineer regarding administration of "the one fill rule" for a particular reservoir. These actions focus on specific disputes among and between specific water users and/or state water officials.[5]

■ In contrast, the General Assembly designed the resume notice and newspaper publication procedure for water matters that involve the interrelationship of all the water right priorities on the stream. This procedure is calculated to alert all water users on the stream system whose rights may be affected by the application, and provide an opportunity for any person to participate in the water right proceeding and to oppose the application. *City of Thornton v. Bijou Irrigation Co.*, 926 P.2d 1, 24 (Colo.1996).

■ The applicants in this case filed an application to confirm the priorities of existing water rights decreed in prior adjudications to their ditches. This was not an attack on the Tribe's ownership interest in its decrees; rather, it was a bona fide effort to determine the relative priority of the Ditch Companies' rights in relation to all other water decreed uses of stream water. The applicants filed this application after the Division Engineer for Water Division No. 7 asserted in response to the Winter Applications that the Ditch Companies already had the right to make wintertime stockwater use in reliance on the priority dates specified in the Initial Decrees.

The resume notice and newspaper publication procedure is designed to protect the rights of water users, like the Tribe, whose rights may be affected by an application for determination of a water right. The Tribe had a right to file a statement of opposition within the time prescribed in the statute, but failed to do so.

### 3. The Resume Notice and Publication in This Case Proceeded in Accordance with the Statute

Section 37–92–302(3)(a) sets out the requirements for resume notice and newspaper publication. It provides, in part:

> Not later than the fifteenth day of each month, *the water clerk shall prepare a resume of all applications in the water division which have been filed in his office during the preceding month. The resume shall give* the name and address of the applicant, *a description of the water right* or conditional water right *involved,* and a *description of the ruling sought.*

(Emphasis added).

Section 37–92–302(3)(b) goes on to provide that "[n]ot later than the end of such month,

---

5. Other matters that involve water in some way may simply not be considered a water matter that is within the jurisdiction of a water court. For example, who owns the title to a water right or a share in a mutual ditch company is not a water matter within the special jurisdiction of the water court. *See, e.g., Humphrey v. Sw. Dev. Co.*, 734 P.2d 637, 640–41 (Colo.1987); *Jacobuc-* *ci v. District Court*, 189 Colo. 380, 541 P.2d 667, 674 (1975). In *Groundwater Appropriators of the South Platte Basin v. City of Boulder*, 73 P.3d at 23, we refused to consider a request for injunction by some parties to a conditional water right application case because it was unrelated to the application in the case and beyond the special statutory jurisdiction of the water court.

the water clerk shall cause such publication to be made of each resume or portion thereof in a newspaper or newspapers as is necessary to obtain general circulation once in every county affected, as determined by the water judge."

Section 37–92–302(1)(b) and (c) provide a time period in which a party may file opposition statements:

(b) Any person, including the state engineer, who wishes to oppose the application, may file with the water clerk a verified statement of opposition setting forth facts as to why the application should not be granted or why it should be granted only in part or on certain conditions. . . .

(c) Such statement of opposition must be filed by the last day of the second month following the month in which the application is filed.

Section 37–92–302(3)(I)(D) sets forth the monthly means by which all the holders of water rights potentially affected by determinations of water right applications depend upon for notice, and they are bound thereby:

(D) *On and after January 1, 2006, not later than the end of each month, the water clerk shall post a copy of the resume on the water court's web site.* Not later than the end of such month, the referee or the water clerk shall send a copy of such resume by mail or electronic mail to any person who the referee has reason to believe would be affected. *The water clerk shall notify each person who has requested a copy of the resume by submitting his or her name and electronic mail address to the water clerk of the availability of the resume on such web site. The water clerk shall maintain an electronic mailing list of such names and addresses, and a person desiring to have his or her name and address retained on the list shall resubmit the information by January 5.*

(Emphasis added).

### 4. Application to this Case

 In the case before us, the water clerk published notice of the consolidated application in Water Division No. 7's monthly-resume within the local newspaper, as provided by the 1969 Act. The monthly resume also appeared on the water court's web page at www.courts.state.co.us/courts/water/index.cfm.

As a result, the Southern Ute Tribe and all other water users on the stream received the requisite legal notice. The Tribe argued to the water court and now to us that it was also entitled to personal service under C.R.C.P. 4 and 19, in lieu of or in addition to resume notice. The Tribe is not entitled to personal service, nor must personal service be effectuated on any or all other water users on the stream who may be affected by the water court's determination of the Ditch Companies' water rights.

The General Assembly enacted the resume notice and newspaper publication procedure to serve the dual purpose of providing due process notice to all users of water rights on the stream, so they could decide whether to participate in the water court proceedings through filing a timely statement of opposition, and, whether or not they do so, bind them to the results of the adjudication. *Williams v. Midway Ranches Prop. Owners' Ass'n, Inc.*, 938 P.2d 515, 524 (Colo.1997).

 The resume notice and newspaper publication procedure is equally applicable to federal reserved and tribal water rights as to Colorado prior appropriation water rights. *See United States v. Bell,* 724 P.2d at 641. In three cases vigorously litigated by our state to a successful conclusion, the United States Supreme Court has recognized and upheld the legal efficacy of Colorado's case-by-case adjudication method employing the resume notice and newspaper publication procedure, notifying and binding federal agencies and tribal water rights pursuant to the waiver of sovereign immunity Congress authorized through the 1952 McCarran Amendment. *See United States v. Dist. Court for Eagle County,* 401 U.S. 520, 91 S.Ct. 998, 28 L.Ed.2d 278 (1971); *United States v. Dist. Court for Water Div. No. 5,* 401 U.S. 527, 91 S.Ct. 1003, 28

L.Ed.2d 284 (1971); *Colo. River Water Conservation Dist. v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). The impractically or virtual impossibility of effectuating personal service on the owners of all water rights on a large steam system, such as the Colorado, South Platte, or Arkansas watersheds, underlies this statutory procedure.

In summary, the application for determination of a water right in this case involves whether an adjudicated priority decreed in a prior case encompasses wintertime stockwater use. Publication of the resume and newspaper notice in this case gave notice of the application to the Southern Ute Tribe, along with the holders of all other water rights on the Pine River, and conferred jurisdiction on the water court to adjudicate the application.

The 1969 Act does not require that every application for determination of a water right must result in assignment of a new priority date. An applicant who holds a prior adjudicated decree may file an application with the water court for review and determination of the scope and content of the prior decree. This is consistent with the General Assembly's overarching purpose that the Act be construed and administered consistent with the doctrine of prior appropriation. *Empire Lodge Homeowners' Assn. v. Moyer,* 39 P.3d 1139, 1146–47 (Colo.2001).

### C.

### Relation–Back Doctrine Applies to Belated Verification

Any person who desires a determination of a water right must file a "verified application" with the water clerk. § 37–92–302(1)(a). Statements of opposition to applications for a determination of a water right must be filed by the last day of the second month following the month in which the application was filed. § 37–92–302(1)(c).

Here, the Ditch Companies filed their application on March 25 but omitted a verification. On that same day, the Ditch Companies sent to the Tribe a copy of the application. The water clerk published notice of the application in the Durango Herald Newspaper in early April. At some point, the Ditch Companies realized their mistake in not verifying the application and one of them filed verification with the court on May 27. On June 30, the Tribe submitted its statement of opposition and motion to intervene.

The water court denied the Tribe's statement of opposition as untimely, finding the verification cured any defect and related back to the date of the original application pursuant to C.R.C.P. 15(c). Therefore, the last day for statements of opposition to be filed was May 31, a full month before the Tribe submitted their statement on June 30. The Tribe alleges that the failure of the Ditches to verify the application at the time of its filing violated statutory prerequisites for the matter to proceed, and cannot be cured by a later verification. Therefore, the verification did not "relate back," and the Tribe's statement of opposition fell within the time limits of section 37–92–302(1)(c). We disagree.

### 1. Amendments to Pleadings and Relation Back

C.R.C.P. 15 governs amendments to pleadings and relation back issues in water court proceedings, including amendments to applications. *City of Thornton v. City of Fort Collins,* 830 P.2d 915, 922–23 (Colo.1992); *United States v. Bell,* 724 P.2d at 635. C.R.C.P. 15(c) provides that, when a claim asserted in an amended pleading "arises out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading." *See Thornton,* 830 P.2d at 922 (holding that C.R.C.P. 15(c) operates to ensure interested parties are aware of the claims in the amendment from the date of the original application).

In *Thornton,* we held that an amendment to an application that did not change the source, amount and use of Poudre River water, but only differed in the number of diversions, properly related back to the date of the original application. *Id.* at 923. The initial application and the amendment both functioned to put those parties with interests

on the river on notice. In contrast, we denied the relation back of the amendment in *United States v. Bell,* 724 P.2d at 639, because the source of the claimed water in the amendment differed from the original application. Due to this difference, insufficient notice was provided by the original application to parties who had interests in the water source newly designated by the amendment. *Id.*

**2. Verification**

The Tribe contends that the verification requirement of 37–92–302(1) must be strictly construed, and the unverified application should have been dismissed as improper because verification is a statutory requirement. However, in *SL Group, LLC v. Go West Indus., Inc.,* 42 P.3d 637, 641 (Colo.2002), we found that only the *notice* requirements of the 1969 Act must be strictly construed, in order to satisfy due process concerns. *Id.* ("It is an elementary and fundamental requirement of due process in any proceeding which is to be accorded finality that all interested parties be given notice reasonably calculated, under all the circumstances, to apprise them of the pendency of the action and afford them an opportunity to present their objections."); *see also Closed Basin Landowners Ass'n v. Rio Grande Water Conservation Dist.,* 734 P.2d 627, 634 (Colo.1987) (applicant must strictly comply with notice provisions of the 1969 Act).

■ Lack of verification is a technical defect in an application, and "[g]enerally, courts should be flexible when ruling on a motion to amend pleadings and disregard technical errors not affecting the substantial rights of parties." *Currier v. Sutherland,* 215 P.3d 1155, 1161 (Colo.App.2008), *aff'd* 218 P.3d 709 (Colo.2009); *see Edelman v. Lynchburg College,* 535 U.S. 106, 122 S.Ct. 1145, 152 L.Ed.2d 188 (2002)(permitting late-filed verification of employment discrimination to relate back to original charge, even though the time for filing had expired); *see also Becker v. Montgomery,* 532 U.S. 757, 121 S.Ct. 1801, 149 L.Ed.2d 983 (2001)(federal rule requiring signature did not prevent later cure of a signature defect from relating back to date of original pleading).

C.R.C.P. 15 requires that "leave [to amend] shall be freely given when justice so requires." We have interpreted this phrase liberally:

Although leave to amend is not to be granted automatically, the court should not impose arbitrary restrictions on the application of the rule or exercise its discretion in a manner that undercuts its basic policy. Pleadings are not sacrosanct, *Brown v. Schumann,* 40 Colo.App. 336, 339, 575 P.2d 443, 445 (1978), and amendments thereto should be granted in accordance with the overriding purposes of our rules of civil procedure—"to secure the just, speedy, and inexpensive determination of every action." C.R.C.P. 1(a). The United States Supreme Court in *Foman v. Davis,* 371 U.S. 178 [83 S.Ct. 227, 9 L.Ed.2d 222] (1962), outlined the dominant considerations applicable to the resolution of requests for amendatory pleading: "In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given.'"

*Varner v. District Court,* 618 P.2d 1388, 1390 (Colo.1980).

**3. Application to this case**

■ The belated verification the Ditch Companies filed did not change the amount, the source, or the use of the water claimed in the original application. *Cf. United States v. Bell,* 724 P.2d at 639. The amendment only served to verify the application previously filed. *See Black's Law Dictionary* 1698 (9th ed. 2009) (purpose of verification is to confirm truth or correctness of pleading by affidavit or oath). The Tribe cannot claim lack of notice due to the absence of verification, as the water resume provides notice of all pending water rights applications to interested parties on the stream, regardless of whether the application was verified at the time of filing. *See* § 37–92–302(3) (describing the content of the resume). Not only did the

Tribe receive resume notice, it received actual notice of the contents of the application on the day the Ditch Companies filed the original application.

C.R.C.P. 15(c) allows amendments to relate back to the date of the original pleading so long as the interested parties received notice of the amended claim at the time of the original pleading. *See United States v. Bell,* 724 P.2d at 635; *Thornton,* 830 P.2d at 915. The amendment in this case satisfied the notice requirement and the water court properly disallowed the Tribe's statement of opposition, which was filed a month late, for non-compliance with the time frame specified in section 37–92–302(1)(c).

### D.

### The Water Court Did Not Abuse Its Discretion in Denying Intervention

On the same day it filed its untimely statement of opposition, the Tribe filed a motion to intervene in this case. The water court denied this motion because the Tribe did not meet the statutory requirements for intervention under section 37–92–304(3). The court denied the intervention motion and disallowed its untimely statement of opposition. We find no abuse of discretion.

#### 1. Requirements for Intervention

Section 37–92–304(3) provides that

[a]ny person may move to intervene in proceedings before the water court upon paying of a fee ... and *upon a showing of mistake, inadvertence, surprise, or excusable neglect* or to support a referee's ruling. The water court *shall grant the motion to intervene only if* intervention is sought no less than thirty days before any pretrial conference ... and if *intervention will not unduly delay or prejudice the adjudication of the rights of the original parties.*

(Emphasis added). Thus, a party may move to intervene upon a showing of mistake, inadvertence, surprise or excusable neglect. Upon such a showing, the court must grant the motion if the request is made at least 30 days before any pre-trial conference, and no undue delay or prejudice will arise. If the

party seeking intervention is unable to demonstrate excusable neglect or any of the other prerequisites to intervention, the water court does not abuse its discretion in denying intervention.

To warrant intervention for excusable neglect, the circumstances must show that "there has been a failure to take proper steps at the proper time, not in consequence of carelessness, but as the result of some unavoidable hindrance or accident." *Farmers Ins. Group v. Dist. Court,* 181 Colo. 85, 507 P.2d 865, 867 (1973). Therefore, in the absence of "personal tragedy, illness, family death, destruction of files, or other similar situations which would cause a reasonably prudent person to overlook a required deadline," failure to meet a deadline is not excusable neglect. *Id.*

In *SL Group,* 42 P.3d at 641, we construed the excusable neglect requirement in the 1969 Act as an extension of due process notice concerns. While "excusable neglect" is not defined by statute, "it is clearly an element of a statutory scheme designed ... to increase the likelihood that parties actually affected by the adjudication will have a meaningful opportunity to be heard, despite the statute's abandonment of a requirement of personal service." *Id.* There, contrary to the water clerk's responsibilities under section 37–92–302(3), the clerk failed to mail the application to a person who owned property the ditch ran through. Under the circumstances, because a reasonably careful person would not have been notified of the action, we held that the landowner's failure to file a timely protest was due to excusable neglect. *Id.* at 642.

#### 2. The Water Court Did Not Err

Whether the Tribe met the criteria for intervention in this matter is a question we review for an abuse of discretion. *In re K.L.O–V.,* 151 P.3d 637, 642 (Colo.App. 2006). Abuse of discretion occurs only if the water court's decision is manifestly arbitrary, unreasonable, or unfair under the circumstances. *Municipal Subdistrict, N. Colo. Water Conservancy Dist. v. OXY USA, Inc.,* 990 P.2d 701, 710 (Colo.1999).

The Tribe argues that its failure to file a timely statement of opposition was due to excusable neglect, because it believed the Ditch Company was filing a declaratory judgment action that was subject to the personal service requirements of C.R.C.P. 19 and 4. However, whatever it may have assumed, the application in this case plainly qualifies under the water right determination provisions of 37–92–302(1)(a) and the resume and newspaper publication provisions of section 37–92–302(3)(a). Therefore, as a matter of law, the water court obtained jurisdiction to enter a judgment on an application that affected the relative priorities of all water rights decreed to structures on the Pine River.

Unlike the petitioners in *SL Group*, 42 P.3d at 641, the Tribe received actual and resume notice of the application, and it acknowledged the existence of this application in its consent to place the Winter Applications on hold pending the outcome of this case. In its order denying the intervention, the water court determined that the Tribe's allegations of mistake, surprise, inadvertence, and excusable neglect were factually unfounded by any evidence that meets the criteria for intervention specified in section 37–92–304(3).

■ After finding the Tribe did not demonstrate excusable neglect, the court also noted that granting the Tribe's motion to intervene would result in undue delay or prejudice to the Ditch Companies. The Division Engineer's consultation report, filed before the Tribe's motion to intervene, set out the basis for a recommended judgment that the two previously adjudicated decrees contained priorities for year round stockwater and domestic use, including wintertime use. In denying the Tribe's motion to intervene, the water court found that "the Division Engineer and the Applicant have worked to resolve the outstanding issues in this and three other cases" and "the intervention would frustrate the legislative intent of expediency and finality." If the court were to grant the motion, "the matter will not likely be resolved for at least one to two years and the Applicant will be required to spend tens of thousands of dollars on a trial and related

work to get the result they have already agreed upon with the Division Engineer."

Pursuant to section 37–92–302(4) the Division Engineer has a statutory role and a duty to consult with and advise the water court regarding the contents of the application. Under water court rule 6(e), the referee "shall institute consultation with the division engineer in every case promptly after the last day for filing statements of opposition." The water judge is authorized by section 37–92–302(4) to act as the referee, as occurred in this case.

The General Assembly has prescribed in section 37–92–303(1) that the goals of the referee shall include a ruling on each unopposed application, within sixty days after the last day on which statements of opposition may be filed, and all other applications as promptly as possible. *See* Rule 6(e), Uniform Local Rules for All State Water Court Divisions. Thus, both the statute and the water court rules favor the just, speedy, cost efficient disposition of water court cases. *Id.*

The water court concluded that the Tribe failed to meet any of the statutory criteria for intervention and could not cure, through its intervention motion, its failure to timely file a statement of opposition and participate prior to the referee's ruling.

In light of the facts and rationale the water court employed in its written ruling, we cannot say that denial of the intervention motion was manifestly arbitrary, unreasonable, or unfair. *Municipal Subdistrict, N. Colo. Water Conservancy Dist. v. OXY USA, Inc.*, 990 P.2d at 710. The water court did not abuse its discretion in denying the Tribe's intervention motion and in disallowing its untimely statement of opposition.

### III.

Accordingly, we affirm the water court's judgment.

Justice RICE dissents, and Justice COATS and Justice EID join in the dissent.

Justice RICE, dissenting.

In enacting the Water Right Determination and Administration Act of 1969, §§ 37–

92–101 to –602, C.R.S. (2010) ("WRDAA"), the General Assembly sought to create a workable mechanism for adjudicating water rights in Colorado by relaxing the Colorado Rules of Civil Procedure for a limited subset of water matters. The legislature, however, carefully circumscribed the scope of the matters adjudicable under the WRDAA's relaxed resume-notice procedures to ensure due process for the state's water rights holders. By expanding the scope of the term "determination of a water right" to encompass the declaratory review of an already-adjudicated water right, the majority casts aside the WRDAA's due process safeguards and opens the floodgates for the scope of already-adjudicated water rights to be revisited and reinterpreted without direct notice to rights holders. Because this interpretation is not in comport with the plain language of the WRDAA, the legislature's intent, or this Court's precedent, I respectfully dissent.

## I. Issues on Appeal and Standard of Review

The threshold issue in this appeal is whether the water court had the authority to adjudicate the Ditch Companies' application under the WRDAA's specialized resume-notice procedures. Accordingly, I begin by interpreting the scope of matters amenable to adjudication under those procedures. Statutory interpretation is a question of law that this Court conducts de novo. *People v. Disher,* 224 P.3d 254, 256 (Colo.2010) (citation omitted). When conducting statutory interpretation, the Court's task is to give effect to the intent of the General Assembly and the purpose of the statute's legislative scheme. *Id.* In doing so, we read the statute's provisions as a whole, giving consistent, harmonious, and sensible effect to all their parts. *Moffett v. Life Care Ctrs.,* 219 P.3d 1068, 1072 (Colo.2009). If the plain language of the statute is ambiguous, we look to other factors, including the context of the statute's enactment and the legislative history, to determine the General Assembly's intent. § 2–4–203(1), C.R.S. (2010); *People v. Valenzuela,* 216 P.3d 588, 590 (Colo.2009).

Contrary to the majority's opinion, I conclude that the Ditch Companies' requested relief—essentially, a declaratory review of the scope of water rights adjudicated in previous decrees[1]—is not within the scope of matters amenable to adjudication under the WRDAA's resume-notice procedures. Accordingly, the majority's consideration of the relation-back doctrine and intervention under the WRDAA is unnecessary; I would hold instead that the Ditch Companies' application for declaratory review was subject to the ordinary requirements of service of process and mandatory joinder for declaratory judgment actions under the Colorado Rules of Civil Procedure, and that the water court's failure to enforce those requirements in this case rendered its adjudication null.

## II. Analysis

### A. Water Court Jurisdiction and WRDAA Resume–Notice Procedures

The WRDAA is a statutory scheme designed by the General Assembly to simplify certain aspects of the complex task of administering Colorado water rights. *Bd. of Cnty. Comm'rs v. United States (In re the Application for Water Rights of the Bd. of Cnty. Comm'rs),* 891 P.2d 952, 964 (Colo.1995). Section 37–92–203 of the WRDAA establishes specialized water courts throughout the state with exclusive jurisdiction over "water matters," which include the review of the scope of existing water rights decrees. *See Crystal Lakes Water and Sewer Ass'n v. Backlund,* 908 P.2d 534, 542 (Colo.1996).

The Colorado Rules of Civil Procedure generally apply to the water courts. *Groundwater Appropriators v. City of Boulder (In re the Application for Water Rights of Groundwater Appropriators),* 73 P.3d 22, 27 (Colo.2003). Section 37–92–302 of the WRDAA, however, creates a "special statutory proceeding" under C.R.C.P. 81 that, for a certain subset of water matters, abrogates the ordinary requirements of service of process under C.R.C.P. 4, *Gardner v. State,* 200

---

1. The Ditch Companies' application variously described the requested relief as a *"determination of water rights"* and as a *"confirm[ation]"* and

*"interpret[ation]"* that the Initial Decrees "include[] year round stockwatering and domestic uses."

Colo. 221, 223–24, 614 P.2d 357, 358–59 (1980), and mandatory joinder under C.R.C.P. 19, *Se. Colo. Water Conservancy Dist. v. Ft. Lyon Canal Co.*, 720 P.2d 133, 142–43 (Colo.1986). Instead of complying with those requirements, anyone seeking certain water rights-related rulings can simply file an application, pursuant to section 37–92–302(1)(a), with the appropriate water division's clerk, who then publishes the application, pursuant to section 37–92–302(3), as part of a publicly available monthly "resume" of all such applications. *Groundwater Appropriators*, 73 P.3d at 26–27.

This resume-notice procedure is designed to alert all water users on the stream of the application's pendency while sparing the applicant the difficulty of identifying, joining, and serving everyone who might be affected by the applied-for ruling. *Bar 70 Enters., Inc. v. Tosco Corp.*, 703 P.2d 1297, 1302–03 (Colo.1985). As a result, parties seeking to oppose the application must affirmatively do so by timely filing a statement of opposition pursuant to section 37–92–302(1)(b)–(c). *Groundwater Appropriators*, 73 P.3d at 27.

While the convenience of the WRDAA's resume-notice procedures is undeniable, the water court cannot use the procedures in every water matter over which it has jurisdiction. *See id.* The water court's authority to adjudicate applications using the resume-notice procedures stems directly from and is circumscribed by the scope of section 37–92–302(1)(a). *See id.* at 27; *Gardner*, 200 Colo. at 228, 614 P.2d at 362. Where the water court lacks the authority to use the resume-notice procedures, it must proceed in compliance with the service of process and mandatory joinder requirements of C.R.C.P. 4 and 19. *See Gardner*, 200 Colo. at 228, 614 P.2d at 362.

Here, there is no dispute that the water court had jurisdiction under section 37–92–203(1) to adjudicate the Ditch Companies' application. The water court, however, ruled that section 37–92–203(1) gave it not only the

jurisdiction to adjudicate the Ditch Companies' application, but the authority to do so under the WRDAA's resume-notice procedures rather than the ordinary rules of civil procedure. In so ruling, the water court erroneously conflated the concepts of jurisdiction and procedural authority. The water court's authority to invoke the statutory resume-notice procedures flows not from its jurisdiction over water matters generally under section 37–92–203(1), but rather from the resume-notice application procedures in section 37–92–302(1)(a).

Because the water court did not articulate any independent justification for invoking resume notice in adjudicating the Ditch Companies' application, I turn to the scope of rulings amenable to adjudication under section 37–92–302(1)(a).

### B. The Scope of Section 37–92–302(1)(a)

Section 37–92–302(1)(a) "expressly authorizes" the types of rulings amenable to adjudication under the resume-notice procedures in section 37–92–302(3). *Gardner*, 200 Colo. at 227, 614 P.2d at 361. In particular, the statute allows for resume-notice adjudication of applications for a variety of water rights rulings: a change of a water right, approval of an augmentation plan, a finding of reasonable diligence, approval of a water exchange, and approval of an out-of-state water use. § 37–92–302(1)(a).

At issue in this case, however, is section 37–92–302(1)(a)'s provision for the resume-notice adjudication of applications for a "determination of a water right." [2] The majority holds that the Ditch Companies' requested relief—a declaratory review of the water rights already adjudicated under the Initial Decrees—is a "determination of a water right" under the statute and is therefore amenable to adjudication under the resume-notice procedures. More specifically, the majority adopts a sweeping dictionary definition of the term "determination of a water

[2]. The full text of the statute allows for the resume-notice adjudication of a "determination of a water right or a conditional water right and the amount and priority thereof, including a determination that a conditional water right has become a water right by reason of the completion of the

appropriation." § 37–92–302(1)(a). As discussed infra Part II.C, the "determination of a water right" is a separate application type from the other types of applications amenable to resume-notice adjudication.

right" that encompasses essentially any ruling requiring the water court to answer a question involving a water right.

Construing the term so broadly, however, is irreconcilable with this Court's long-standing recognition of rulings that, while plainly implicating questions involving water rights, do not involve a "determination of a water right" under the meaning of section 37–92–302(1)(a). "[D]etermination of a water right," is a specialized term of art in Colorado water law, and this Court has expressly disapproved of attempts by litigants to "expand, virtually without limit, the water matters that could be litigated" as a "determination of a water right" under the WRDAA's resume-notice procedures. *Groundwater Appropriators*, 73 P.3d at 27.

Against this backdrop, I reject the expansive definition of "determination of a water right" adopted by the majority. A detailed analysis of section 37–92–302(1)(a) reveals that, contrary to the majority's opinion, the declaratory review sought by the Ditch Companies is not within the scope of the term "determination of a water right" under the meaning of the statute.

### C. The Scope of a "Determination of a Water Right"

When addressing the scope of the term "determination of a water right" in the past, this Court has historically excluded rulings that involve the review and application of *already-adjudicated* water rights. Those rulings include water rights-based injunctions, *see Groundwater Appropriators*, 73 P.3d at 23, findings that water rights have been abandoned, *see Gardner*, 200 Colo. at 223, 614 P.2d at 358, and resolutions of water rights ownership disputes, *see Humphrey v. Sw. Dev. Co.*, 734 P.2d 637, 640–41 (Colo. 1987).

This Court's line of reasoning in *Gardner, Groundwater Appropriators*, and *Humphrey* indicates that water rights already recognized, or "determined," cannot be "determined" yet again as the subject of a new "determination of a water right" under section 37–92–302(1)(a). While the water court can of course review and apply already-adjudicated water rights in other contexts—

sometimes with resume notice, such as when considering a change of a water right, and sometimes without, such as when issuing an injunction—none of those contexts falls within the scope of a "determination of a water right."

Like the already-adjudicated rights at issue in *Gardner, Groundwater Appropriators*, and *Humphrey*, the rights that the Ditch Companies sought to "determine" here were already the subject of a "determination" during the general and supplemental adjudications that led to the Initial Decrees. This similarity suggests that the Ditch Companies' application for declaratory review is the same type of attempt to seek a new "determination" of already-adjudicated water rights that we have consistently rejected in the past. That the Ditch Companies sought a new determination of many rights rather than only one or a few only amplifies the applicability of our past precedent.

Nevertheless, it is sensible to consider as a narrow issue of first impression whether the review sought by the Ditch Companies falls within the scope of a "determination of a water right" under section 37–92–302(1)(a). Accordingly, I begin by reviewing the language of the statute, its legislative history, and this Court's past precedent.

The WRDAA does not explicitly define the term "determination of a water right," so the surrounding language in the statute provides a helpful context for construing the term. The original version of the statute enumerated the term along with several other types of water rights-related applications amenable to adjudication under the statutory resume-notice procedures:

> Any person who desires a *determination of a water right* or a conditional water right and the amount and priority thereof, including a determination that a conditional water right has become a water right by reason of the completion of the appropriation, a determination with respect to a change of a water right, approval of a plan for augmentation or biennial finding of reasonable diligence, shall file . . . a verified application. . . .

Ch. 373, sec. 1, § 148–21–18(1), 1969 Colo. Sess. Laws 1200, 1207 (emphasis added) (later recodified at section 37–92–302(1)(a)). The statute as currently amended makes minor changes to the enumerated application types:

Any person who desires a determination of a water right or a conditional water right and the amount and priority thereof, including a determination that a conditional water right has become a water right by reason of the completion of the appropriation, a determination with respect to a change of a water right, approval of a plan for augmentation, *finding of reasonable diligence, approval of a proposed or existing exchange of water* ..., or *approval to use water outside the state* ... shall file ... a verified application....

§ 37–92–302(1)(a) (emphasis added to show the application types changed or added since the original version).[3]

Despite the slight differences between the current and original versions of the statute, their structures are essentially the same, containing the term "determination of a water right," followed by the word "including," followed by several other types of applications amenable to adjudication with resume notice. This structure yields a critical ambiguity: namely, whether only the first type of application following the word "including"—a determination that a conditional water right has become a water right—is a subtype of "determination of a water right," or whether *all* of the subsequent application types are subtypes of "determination of a water right." The distinction is essential to determine whether "determination of a water right" is a broad, general umbrella term encompassing a variety of application types amenable to resume-notice adjudication, or rather one specific, independent application type among several other types of applications that are also amenable to resume-notice adjudication.

The majority summarily concludes that each of the types of application following the word "including" is a subtype of "determina-

tion of a water right." Maj. op. at 1233 n. 4. That conclusion, however, does not comport with the plain text of section 37–92–302(1)(a), the legislature's intent in enacting the WRDAA, or this Court's precedent.

First, the plain text of the statute enumerates varied types of applications, which include not only "determination[s]" but also "approval[s]" and "finding[s]." If the "determination of a water right" was truly a superset of the types of enumerated applications that follow, it is unclear why the legislature would have deemed some applications "determinations" but others something else altogether. And the application types differ not only in the language used to describe them, but in their fundamental operation. *See* discussion *infra* note 6.

Furthermore, the legislative council's report on the WRDAA to the General Assembly contemplated applications for both "persons *who want* to have a determination of a water right or a conditional water right, *or who want* to change a water right." Colo. Legis. Council, Explanation of Proposed Water Legislation, Research Pub. No. 143 at 7 (Dec. 1968) (emphasis added). The report's distinct enumeration of a "determination of a water right" on the one hand and a "change [of] a water right" on the other indicates an understanding that applications for a "change [of] a water right" were neither the same as nor a subtype of applications for a "determination of a water right." While the report does not make the same distinction between a "determination of a water right" and all the other application types that follow in the statute, it clarifies the legislature's contemplation of multiple types of applications amenable to adjudication under the statute rather than a single monolithic category of "determination of a water right."

Finally, following the legislature's lead, this Court affirmed in *Gardner* that the statute contains multiple types of applications in addition to the "determination of a water right," rather than several subtypes of "determination of a water right." *See* 200 Colo.

---

**3.** The current version of the statute also includes an additional sentence, which states: "The term 'determination of a water right or conditional water right' includes any [exportation] plan or

change in [exportation] plan ... that is or has been incorporated into a decree." § 37–92–302(1)(a).

at 227, 614 P.2d at 361. While the WRDAA has been amended since *Gardner* was decided,[4] the ambiguity clarified by this Court in *Gardner* remains the same.

In light of the statutory text, the legislative history, and this Court's precedent, it is apparent that the term "determination of a water right" is not a broad catch-all for a wide variety of water rights-related applications, illustrated by all the types of applications that follow it in the statute. Rather, it is a narrow reference to a "special proceeding" tailored for "essentially one purpose": the initial adjudication of water rights and establishment of their priority date by a court. *See Groundwater Appropriators*, 73 P.3d at 27 (citations omitted).[5] Thus, I turn to the WRDAA's priority system to consider the purpose of a "determination of a water right" and its compatibility with the declaratory review sought by the Ditch Companies.

### D. The Purpose of a "Determination of a Water Right"

As with the other types of applications enumerated in section 37–92–302(1)(a), the one purpose of a "determination of a water right" is readily apparent from viewing the application type in the context of the WRDAA as a whole. *See Gardner*, 200 Colo. at 227, 614 P.2d at 361. More specifically, the purpose of a "determination of a water right" is illuminated by the WRDAA's priority assignment system in section 37–92–306.

The language of section 37–92–306, describing priority assignments for *"water rights or conditional water rights* adjudged and decreed on *applications for a determination of the amount and priority thereof"* (emphasis added), precisely tracks the language of section 37–92–302(1)(a), which describes the application process for *"a determination of a water right or a conditional water right* and *the amount and priority thereof"* (emphasis added). Because the language of section 37–92–306's priority assignment system is inextricably linked with the "determination of a water right," 1 consider whether the declaratory review sought by the Ditch Companies in this case is compatible with the mechanics and purpose of the priority assignment system.

### i. Priority Mechanics

The WRDAA's system for assigning water rights priorities under section 37–92–306 establishes that any water right judicially recognized pursuant to an application for a "determination of a water right" under section 37–92–302(1)(a) must carry a new priority date tied to the time of adjudication. *See Shirola v. Turkey Canon Ranch, LLC (In re the Application for Water Rights of Turkey Canon Ranch)*, 937 P.2d 739, 748 (Colo.1997) (citations omitted); *see also United States v. Dist. Ct.*, 401 U.S. 527, 529, 91 S.Ct. 1003, 28 L.Ed.2d 284 (1971) ("It is also said that the [WRDAA] makes all water rights confirmed under the new procedure [for a "determination of a water right"] junior to those previously awarded.").[6] A holder of such a right must cease watering if "called out" by a holder of a previously-adjudicated right. *Shirola*, 937 P.2d at 749.[7]

In contrast, the declaratory review granted by the water court maintains the original 1934 and 1965 priority dates of all the water

---

4. *See* discussion *supra* Part II.C.

5. Of course, this reality does not limit or implicate the water court's authority to adjudicate the other types of applications enumerated in section 37–92–302(1)(a)—a change of a water right, approval of an augmentation plan, a finding of reasonable diligence, approval of a water exchange, and approval of an out-of-state water use—with resume notice.

6. Section 37–92–306 does not result in the assignment of a new priority date for adjudications of applications seeking relief other than a "determination of a water right" under section 37–92–302(1)(a). For example, no new priority assign-

ment is implicated by an application for a change of a water right, *see generally High Plains A & M, LLC v. Se. Colo. Water Conservancy Dist.*, 120 P.3d 710 (Colo.2005), or an approval of an augmentation plan, *see generally Empire Lodge Homeowners' Ass'n v. Moyer*, 39 P.3d 1139 (Colo. 2001).

7. Rights adjudicated during the same proceeding are prioritized by an additional priority date tied to the date of the initial appropriation. § 37–92–305(1). Applications for a "determination of a water right" with an appropriation priority date prior to the date of an existing adjudication must carry additional notice pursuant to C.R.C.P. 89.

rights adjudicated under the Initial Decrees—a date tied to the original adjudications of the Initial Decrees rather than the water court's adjudication of the requested declaratory review. Because that review does not assign a new priority date to the water rights adjudicated in the Initial Decrees—a mandatory assignment for water rights adjudicated pursuant to an application for a "determination of water rights" under section 37–92–302(1)(a)—the review necessarily does not comply with section 37–92–306. Since an application for a "determination of a water right" under section 37–92–302(1)(a) must comply with 37–92–306, the review granted by the water court is fundamentally incompatible with an application for a "determination of a water right" under section 37–92–302(1)(a).

The majority purports to resolve this issue by selectively reading section 37–92–306 out of existence in this context. *See* maj. op. at 1234. That approach is not only unsupported by the plain language of the statute, but contravenes the legislature's intent in enacting the WRDAA—to afford certainty to water rights holders.

### ii. The Legislative Purpose of the WRDAA

The WRDAA codifies Colorado's longstanding common law "postponement doctrine," *see Shirola*, 937 P.2d at 750, which prioritizes water rights first by date of adjudication in order to facilitate the administration of water rights adjudicated in separate decrees, *S. Adams Cnty. Water and Sanitation Dist. v. Broe Land Co.*, 812 P.2d 1161, 1163–64 (Colo.1991). This priority system affords water users the ability to establish priority and use section 37–92–302(3)'s relaxed resume-notice procedures as an incentive for seeking early and thorough adjudication of their rights, which in turn provides all users on the river with greater certainty regarding whose needs will take precedence in the likely event of water scarcity. *See Michael F. Browning, A Summary of Colorado Water Law,* 21 Colo. Law. 63, 63–64 (1992).

The declaratory review granted by the water court, however, does not provide the cer-

tainty contemplated by the WRDAA. That type of review revisits already-adjudicated water rights, potentially leading to a result not in line with either the expectations of the parties to the original adjudications or parties to subsequent adjudications of water rights on the same river, both of whom may have relied on the results of the original adjudications. Such review could materially affect the ability of those parties to exercise their water rights, disrupting the certainty the legislature sought to afford in enacting the WRDAA.

While it is not intractably problematic that the type of review granted by the water court might disrupt the expectations of other water rights holders on a river, imposing such a disruption without sufficient notice to the rights holders would pose grave implications for due process. Ensuring due process for water rights holders was a fundamental concern of the legislature in crafting the WRDAA's resume-notice procedures. *See* Colo. Legis. Council, Explanation of Proposed Water Legislation, Research Pub. No. 143 at 6 (Dec. 1968) ("One of the major concepts incorporated in [the initial draft of the WRDAA] is the establishment of a procedure which provides *due process of law* . . . ." (emphasis added)); *see also SL Group, LLC v. Go W. Indus.*, 42 P.3d 637, 641 (Colo.2002) ("The [WRDAA's] scheme . . . protects the *due process concern* for notice . . . ." (emphasis added)).

While the legislature chose to partially abrogate the due process protections of mandatory joinder and service of process for applications for a "determination of a water right" and other applications under section 37–92–302(1)(a) by allowing the use of resume notice, the effect of that abrogation is tempered by various safeguards built into the WRDAA. *E.g., Well Augmentation Subdistrict v. City of Aurora,* 221 P.3d 399, 409 (Colo.2009) (describing the requirements for augmentation plans to protect users with already-adjudicated water rights). In particular, the assignment of a new priority date to water rights adjudicated under an application for a "determination of a water right" guarantees that a holder of previously-adjudicated rights will not lose his place in line to a new applicant

simply because of a lack of notice. This is because he will retain a higher priority to water than the new applicant in the event of scarcity even if he does not intervene in or oppose the new application. As a result, only those who have failed to satisfy the statute's goal of certainty by choosing not to timely adjudicate their rights face the risk of losing their priority by virtue of lack of notice when the resume-notice procedures are used by the water court.

The majority's holding, however, requires holders of rights adjudicated in the early decrees—all of whom have already satisfied the WRDAA's goal of certainty by timely adjudicating their rights—to nonetheless take part in new adjudications to protect their interests. It would be at odds with the purpose of the WRDAA to force those rights holders to vigilantly watch over the monthly water resumes for notice that the scope of their rights is suddenly subject to change.

### iii. The Ditch Companies' Requested Review under the WRDAA

Because the declaratory review sought by the Ditch Companies is incompatible with the WRDAA's priority mechanics governing applications for a "determination of a water right" and fails to afford the certainty and due process safeguards contemplated by the statute, I cannot agree with the majority's conceptualization of the review as a "determination of a water right" within the meaning of section 37–92–302(1)(a). The majority's holding upsets the WRDAA's carefully calibrated balance, allowing litigants like the Ditch Companies to take advantage of the statute's relaxed resume-notice procedures without the corresponding disadvantage of a newly assigned priority date. Thus, I would hold that the type of declaratory review sought by the Ditch Companies is not amenable to resolution under the resume-notice procedures of section 37–92–302(3), and that adjudication of such review is subject to the

relevant portions of the Colorado Rules of Civil Procedure.

### E. The Ditch Companies' Requested Declaratory Review and the Colorado Rules of Civil Procedure

Instead of adjudicating the Ditch Companies' application under the resume-notice procedures, the water court should have required the Ditch Companies to identify the holders of the water rights affected by the requested review, join them as parties pursuant to C.R.C.P. 19, and serve them with process pursuant to C.R.C.P. 4. *See Gardner,* 200 Colo. at 223–24, 614 P.2d at 358. If the Ditch Companies were unable or unwilling to comply, the water court should have dismissed the application. *See id.*

The Ditch Companies' requested review of all the water rights in the Initial Decrees affects not just the Ditch Companies, but all other parties whose water rights were adjudicated under the Initial Decrees and subsequent decrees of water rights on the Pine River. While identifying, joining, and serving all those parties may have been difficult and expensive, their interests nonetheless should have been protected to satisfy the requirements of C.R.C.P. 57. *See People ex rel. Inter–Church Temperance Movement v. Baker,* 133 Colo. 398, 403–05, 297 P.2d 273, 277–78 (1956). Furthermore, the Ditch Companies' burden in this case was tempered by the reality that the inability to seek their requested review and the alleged uncertainty in the decree should not have dissuaded them from exercising their water rights, since nonuse of those rights could have given rise to a finding of abandonment, *Se. Colo. Water Conservancy Dist. v. Twin Lakes Assocs. (In re the Application for Water Rights of O'Neill and Twin Lakes Assocs.),* 770 P.2d 1231, 1237–38 (Colo.1989).[8] Accordingly, the core purpose of declaratory judgments—to clarify rights in advance of the commission of wrongs, *Baker,* 133 Colo. at 404, 297 P.2d at 277 (citation omitted)—is not implicated in this case.[9]

---

**8.** It is also unclear how the imminent filing of new Pine River water rights applications—the Ditch Companies' underlying justification for seeking their requested review—could have prejudiced the Ditch Companies in a way that could be remedied by the requested review.

**9.** While the Ditch Companies contend that an adverse holding might affect the results of cer-

Because the Ditch Companies' application in this case for a declaratory review of the Initial Decrees did not properly seek a "determination of a water right" under the meaning of section 37–92–302(1)(a), the water court therefore erred by adjudicating the application under the WRDAA's resume-notice procedures. When the water court adjudicated a water matter outside the scope of section 37–92–302(1)(a), C.R.C.P. 81 no longer applied and the water court was obligated to proceed in compliance with the service of process and mandatory joinder requirements of C.R.C.P. 4 and 19. *See Gardner*, 200 Colo., at 223–24, 614 P.2d at 358.

While the Ditch Companies argued that e-mailing the Tribe a copy of their unverified application somehow cured this procedural defect, that argument holds no merit. It is fundamental that even a defendant's actual knowledge of the pendency of an action cannot substitute for actual service of process under C.R.C.P. 4. *Weber v. Williams*, 137 Colo. 269, 277, 324 P.2d 365, 369 (1958). Furthermore, a party seeking to serve process by mail must comply with all the requirements of C.R.C.P. 4(g), including filing a verified motion with the court for an order for service by mail. *Jones v. Colescott*, 134 Colo. 552, 553, 307 P.2d 464, 465 (1957). The Ditch Companies filed no verified motion seeking an order for service by mail, and neither an e-mailed copy of an unverified application failing to name the Tribe as a party nor the Tribe's resulting knowledge of the application could have satisfied the Ditch Companies' obligations under C.R.C.P. 4 and 19. Accordingly, I would hold the water court's decree in this case void, and its adjudication of the Ditch Companies' requested review of the Initial Decrees a nullity. *See Weber*, 137 Colo., at 278, 324 P.2d at 369.

### III. Conclusion

While water courts have wide latitude to adjudicate the highly technical matters before them, they must nonetheless take care to abide by the ordinary rules governing civil procedure where the WRDAA's special pro-

cedures do not apply. Because the majority's holding undercuts that requirement at the expense of due process for water rights holders who have undertaken to timely protect their rights under the statute, I dissent.

I am authorized to state that Justice COATS and Justice EID join in this dissent.

tain prior adjudications by the District 7 Water Court, the facts of those adjudications are not

before this Court.